UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF ALASKA

In re:

DENALI FAMILY SERVICES,

Debtor.

Case No. A13-00114-GS
Chapter 11

**MEMORANDUM DECISION ON
DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 20**
[Marletto Family Limited Partnership]

The debtor, Denali Family Services ("DFS"), objects to Proof of Claim No. 20 filed by the Marletto Family Limited Partnership ("Marletto") as exceeding the statutory limits imposed by 11 U.S.C. § 502(b)(6). Marletto's claim arises from its prepetition lease of real property to the debtor. Its amended claim, filed on DFS's rejection of the lease, was for total damages of $1,514,744.18. DFS would limit the claim to $480,500, representing past due rent as of the petition date, future monthly rent for 15 months, and the 2014 real property taxes. In response to DFS's objection, Marletto contends it is entitled to recover these amounts, as well as the balance owed for tenant improvements, a future real estate commission, costs to remodel the premises, attorney fees, and utilities. Mareletto now claims total damages of $1,741,688.60. For the reasons stated below, I find that Claim No. 20 should be allowed in the sum of **$647,758.85.** This sum does not include Marletto's claim for attorney's fees, which is reserved pending supplementation of the record and further order of this court.

**Facts**

On May 24, 2011, DFS and Marletto entered into a *Lease with Option to Purchase* ("*Lease*") for roughly 20,000 square feet of commercial space in a building located at 7521 Brayton Drive, Anchorage, Alaska. The building had formerly been used as a retail/wholesale warehouse for a pet food distributor, and then as a bingo parlor. DFS leased the property from Marletto for the purpose

of operating its day care center, Little Steps Preschool. The *Lease* was for a term of 10 years, with monthly rent payments of $27,000 for the first five years, increasing to $30,000 for the final five years.[1] Under the *Lease,* DFS was liable for tenant improvements in excess of $400,000, payable over five years.[2] The improvements necessary to turn the warehouse space into a preschool were extensive, and resulted in an excess that translated into additional monthly payments for DFS of $3,850.59.[3] The *Lease* was a triple net lease obligating DFS to pay real property taxes, insurance, and maintenance, including repairs and utilities.[4] The *Lease* defined these tenant obligations as additional rents.[5]

The debtor filed its chapter 11 petition on March 3, 2013. It rejected the *Lease* under 11 U.S.C. § 365(a), effective September 15, 2013.[6] Marletto filed an amended proof of claim on August 20, 2013, in the amount of $1,514,744.18.[7] The amended claim included a Schedule of Claim Components that itemized the portions of Marletto's claim attributable to future rent allowed

---

[1] Joint Ex. 1-A, at 1, Art. 1.1(i).

[2] Section 2.5 of the *Lease* obligated Marletto to construct certain tenant improvements for DFS. The *Lease* specifically provided that, "[l]easehold improvements would be capped at $500,000 with any amount over $400,000 amortized over five years at 6% interest paid as additional monthly rent." *Id*. at 2, Art. 2.5. The parties modified this obligation through the *Lease Modification Agreement* ("*Modification*") executed by DFS on August 29, 2011. The *Modification* raised the cap for improvements to $600,000, but retained the obligation that DFS repay amounts in excess of $400,000 "as additional rent amortized over five years at 6% interest." Joint Ex. 2-B, at 1.

[3] Marletto's *Reply to Obj. to Claim* (Docket No. 146), at 8. The parties also do not dispute that the monthly payment for tenant improvements is $3,850.59, for a total of $57,758.85.

[4] Joint Ex. 1-A, at 3-4. Article 5.2 requires that DFS directly pay for all utilities and communication services provided to the property during the term of the *Lease*. In its *Reply*, Marletto estimated the monthly utilities at $15,000 per month, and sought 15 months of monthly utility payments totaling $225,000. At the hearing, Marletto introduced a schedule showing revised total annual utility expenses of $50,264 for a vacant building.

[5] Joint Ex. 1-A, at 3, Art. 3.2.

[6] *Order Granting Mot. to Reject Non-Residential Lease with Marletto Family Partnership Pursuant to 11 U.S.C. § 365(a)*, entered Aug. 22, 2013 (Docket No. 116).

[7] *Proof of Claim No. 20-1*.

2

under 11 U.S.C. § 502(b)(6), the unpaid balance of DFS's obligation for the unpaid tenant improvements, real property tax obligations, the anticipated real estate commission associated with securing a new tenant, costs to make the property suitable for new tenants, and attorney fees.

The debtor objected to Marletto's claim on the ground that it exceeded the statutory maximum, or "cap," allowed under § 502(b)(6). DFS accepted Marletto's assessment that 15 months of future rent was allowable under § 502(b)(6). It also did not dispute Marletto's calculations for the real property tax and the unpaid balance owed for pre-petition rent. For these components, DFS calculated that Marletto's allowed claim should be $480,000.[8] It argues that the other portions of Marletto's claim should be disallowed under the Ninth Circuit's decision in *In re El Toro Materials Co., Inc.*[9]

Marletto filed a detailed *Reply to Objection to Claim* in which it addressed the individual components of its damages.[10] It argues that, in addition to the amounts accepted by DFS, it is entitled to recover the entire remaining balance owed for tenant improvements, a future real estate commission, remodeling costs, attorney fees, and utilities, because these components do not represent damages for lost rental income, and, thus, fall outside of the § 502(b) cap. Alternatively, Marletto contends that even if the tenant improvements and utilities are within the cap, it is entitled to recover the cost for these components, in addition to the future rental payments, for 15 months,

---

[8] This amount consists of the following:

|  | Amount | No. of Payments | Total |
|---|---|---|---|
| **Future Rent** | $ 27,000 | 15 | $ 405,000 |
| **Future Property Tax Obligation** | $ 48,000 |  | $ 48,000 |
| **Balance due as of Petition Date (1 month)** | $ 27,000 | 1 | $ 27,000 |
| **Total:** |  |  | <u>$ 480,000</u> |

[9] *Saddleback Valley Cmty. Church v. El Toro Material Co., Inc. (In re El Toro Material Co., Inc.)*, 504 F.3d 978 (9th Cir. 2007).

[10] Docket No. 146.

3

plus the past due rent outstanding as of the petition date. With the addition of the future projected utility expenses, Marletto increases its demand to $1,741,668.60, calculated as follows:

| | Amount | Number of Payments | Total |
|---|---|---|---|
| Future Rent | $ 27,000.00 | 15 | $ 405,000.00 |
| Tenant Improvement Loan Balance | $ 134,348.60 | | $ 134,348.60 |
| Future Property Tax Obligation | $ 48,000.00 | | $ 48,000.00 |
| Real Estate Commission | $ 92,340.00 | | $ 92,340.00 |
| Costs of Removal of Tenant Property | $ 800,000.00 | | $ 800,000.00 |
| Attorney Fees | $ 10,000.00 | | $ 10,000.00 |
| Pre-Petition Amounts Due Balance Owed as of Petition Date (1 month) | $ 27,000.00 | 1 | $ 27,000.00 |
| Future Utilities and Other Costs | $ 15,000.00 | 15 | $ 225,000.00 |
| TOTAL: | | | $ 1,741,688.60 |

The court held an evidentiary hearing on the claim objection on December 18, 2013. Brandon Lee Walker, Marletto's realtor, testified as to the efforts to re-lease the property after DFS's rejection of the *Lease,* as well the market for the property in its current configuration, and potential other uses for the space. Mr. Walker represented Marletto in the negotiation of the *Lease* with DFS. Marletto bases its claim for the future real estate commission upon the amount it paid for Mr. Walker's services in procuring the DFS *Lease*. Mr. Walker further testified that there is little, if any, market for the property in its present configuration as a day care center. He testified that the one customer who showed any interest in the property as a daycare advised that its current configuration negatively affected its value. Mr. Walker believes Marletto will need to gut the property and attempt to find a tenant more in line with its former commercial use as a

4

retail/wholesale warehouse. He believes this will require substantial renovation from its current condition.

J.A. Ferguson, Marletto's contractor, testified regarding the cost and time that would be required to remove the current tenant improvements and remodel the property to return it to its more traditional use as a retail/wholesale warehouse. Mr. Ferguson estimated that it would cost between $100,000 and $120,000 to remove the tenant improvements, including hauling and disposal. However, he doubted the space could be re-leased, once the tenant improvements were removed, unless Marletto spent an additional $500,000 to $600,000 to remodel the premises, likely back to a retail/wholesale warehouse in conformity with its historical use.

**Analysis**

Under 11 U.S.C. § 502(b)(6), a lessor's claim "for damages resulting from the termination of a lease of real property" is allowable "except to the extent that" it exceeds:

> (A) the rent reserved by such lease, without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease, following the earlier of –
>
> > (I) the date of the filing of the petition; and
> >
> > (ii) the date on which such lessor repossessed, or the lessee surrendered, the leased property, plus
>
> (B) any unpaid rent due under such lease, without acceleration, on the earlier of such dates[.][11]

Thus, § 502(b)(6) caps the damages recoverable that arise from the termination of a lease of real property. It divides the lessor's claim into two distinct components: past due unpaid rent, and "rent reserved." The two components are measured from an applicable date which is defined as the earlier of the petition date, or the date on which the lessor repossessed, or the lessee surrendered,

---

[11] 11 U.S.C. § 502(b)(6).

5

the premises.[12]  Claims for unpaid rent, without acceleration, due as of the applicable date are recoverable without limitation.[13]  However, claims for rent reserved are only allowed, "without acceleration, for the greater of one year, or 15 percent, not to exceed three years, of the remaining term of such lease."[14]  While § 502(b)(6) governs the amount of rent recoverable by a lessor, it does not cap a lessor's claims against a debtor/lessee for collateral damage that arise independent of the rejection of the lease in bankruptcy.[15]

Marletto and DFS agree that the applicable date under § 502(b)(6) is the petition date, and that $27,000 in rent was past due as of that date.  Additionally, the parties agree that the applicable "cap" period for future rent under § 502(b)(6)(A) is 15 months.  The remaining issues, therefore, are the calculation of the monthly "rent reserved" that shall be allowed for 15 months, and what components of Marletto's claim, if any, fall outside the cap because they do not result from the termination of the *Lease.*

### A. The Ninth Circuit's *El Toro* Decision.

The Ninth Circuit's decision in *El Toro* controls the determination of the scope and application of the § 502(b)(6)(2) cap to Marletto's claim.  In *El Toro,* the debtor, a mining company, left one million tons of wet clay "goo," mining equipment, and other materials on the real property after rejecting the lease.  The owner/lessor filed an adversary action to establish a $23 million claim for the clean up and removal of these materials.  The debtor argued that the claim was subject to the cap because the damages resulted from its termination of the lease.  The bankruptcy court found against the debtor on this point, but the Bankruptcy Appellate Panel reversed.  The Ninth Circuit was

---

[12] 11 U.S.C. § 502(b)(6)(A)(i) and (ii).

[13] 11 U.S.C. § 502(b)(6)(B); *In re Energy Conversion Devices, Inc.,* 483 B.R. 119, 124 (Bankr. E.D. Mich. 2012).

[14] 11 U.S.C. § 502(b)(6)(A).

[15] *El Toro,* 504 F.3d at 980-81.

6

called upon to determine whether the lessor's claims resulted from the rejection of a lease, and were subject to the statutory cap.

After examining the history of the treatment of lessors' claims in bankruptcy, the court observed that "[t]he structure of the cap – measured as a fraction of the remaining term – suggests that damages other than those based on a loss of future rental income are not subject to the cap."[16] Critically, the lessor's tort claims arose from the "goo" left on the property, rather than from the rejection of the lease. The damages, therefore, compensated the landlord for damage to the premises rather than a loss of future rental income. The court expressed concern that application of a cap on future rents to include claims for damage to the premises would place lessors in a "materially worse position than other creditors."[17] It also recognized that an expansive application of the cap would create "a perverse incentive" for lessees to "reject otherwise desirable leases in order to gain the benefit of capping unrelated damages."[18]

The Ninth Circuit adopted a "simple test" to determine whether a lessor's claims resulted from the rejection of the lease: "[a]ssuming all other conditions remain constant, would the landlord have the same claim against the tenant if the tenant were to assume the lease rather than rejecting it?"[19] In other words, if the debtor had assumed and performed under the lease, would the claim still remain?[20] If so, the claim exists independently of the lease rejection, and is beyond the statutory cap.[21] In *El Toro,* the Ninth Circuit found that, even if the debtor had assumed the lease and

---

[16] *El Toro*, 504 F.3d at 980.

[17] *Id.*

[18] *Id.* at 981.

[19] *Id.*

[20] *El Toro*, 504 F.3d at 981.

[21] *See In re Brown*, 398 B.R. 215, 219 (Bankr. N.D. Ohio 2008)(Applying *El Toro*, the court excluded from the cap "claims made by a lessor that, on account of a contractual or statutory right, would still exist independently of the lease's termination,")

7

completed its term, the lessor would still hold a tort claim for damage to the property resulting from the "million-ton heap of dirt" left on the property.[22]

### B.     Which Components of Marletto's Claim are Subject to the Cap?

### 1.     Rent, Tenant Improvements, Utilities, and Real Estate Commission.

Marletto narrowly reads *El Toro* as limiting the cap only to damages directly related to the loss of future rental income. It relies heavily upon the Ninth Circuit's observation that limiting large claims for future rental income was proper in light of a lessor's ability to mitigate damages for lost rents by re-leasing the premises.[23] In contrast, Marletto argues that damages for the failure to repay for the tenant improvements or the real estate commission cannot be mitigated. Marletto specifically distinguishes the tenant improvement payments as financing as opposed to future rental income. It points to the fixed amount of the principal balance and the accrual of interest as evidence of an independent obligation. Similarly, it contends that the real estate commission must be excepted from the cap because it is not related to lost rental income either.

The test adopted by the Ninth Circuit is not as narrow as Marletto suggests. The Ninth Circuit specifically rejected any reading of § 502(b)(6) as "a limit on tort claims other than those based on lost rent, rent-like payments *or damages directly arising from a tenant's failure to complete a lease term.*"[24] Rather, under the "simple test" it adopted, if DFS had assumed the *Lease,* and performed under its terms, Marletto would have no claims for rent, the tenant improvements, or utilities.[25] These claims would have been paid. It is only because of DFS's rejection of the *Lease*

---

[22] *El Toro*, 504 F.3d at 980-81.

[23]  *See Id.* at 980.

[24] *Id*. at 982 (emphasis added).

[25] At oral argument, the parties reserved the issue of whether Marletto's attorney's fees are subject to the cap, pending a decision on the remainder of its claim and supplementation of the record as to the amount of fees sought. Accordingly, the court makes no findings regarding this item at this time.

8

that these claims have arisen. They are, therefore, subject to the cap. Similarly, there is no independent basis, apart from the debtor's rejection of the *Lease*, under which DFS is liable for payment of a real estate commission for locating a future tenant. Because it would not be liable for a commission if it had fully performed under the *Lease*, any liability for a commission resulting from the rejection is also subject to the cap.

### 2. Remodeling Costs.

The bulk of Marletto's damages, $800,000, relates to the anticipated costs to remodel the property. Marletto produced testimony that there is little or no market for the property in its present configuration as a day care center. J.A. Ferguson, a professional engineer, provided expert testimony regarding Alaskan construction practices. Mr. Ferguson was involved in the remodel of the property for DFS in 2011 and 2012. He reviewed the project on Marletto's behalf and approved disbursements. Mr. Ferguson noted the unique configuration of the space for numerous classrooms and accommodations for children. He opined that it would cost between $100,000 to $120,000 to remove the tenant improvements, including hauling and disposal. To put the premises in the same condition as it was prior to DFS's lease, for a large, warehouse-style, retail tenant would cost an additional $500,000 to $600,000, according to Mr. Ferguson. To get the premises to this condition, he estimated it would take roughly four to eight months.

Marletto asserts that DFS is liable for remodeling costs under Article 9.1 of the *Lease,* which provides:

> End of Term. At the end of this Lease, Tenant will promptly quit and surrender the Premises broom-clean and in as good condition and repair as the Premises was at the time Tenant took possession of the Premises, reasonable wear and tear excepted. Tenant will remove all of Tenant's furniture, trade fixtures, signage, equipment and other personal property. All alterations, additions and fixtures other than Tenant's trade fixtures, which have been made or installed by either Landlord or Tenant upon the Premises shall remain as Landlord's property and shall be surrendered with the Premises as a part thereof, or shall be removed by Tenant, at the reasonable option of Landlord,

9

in which event Tenant shall at its expense repair any damage caused thereby. . . .[26]

In its *Objection*, DFS argues that if it had assumed and performed the *Lease* there would be no such claim. Article 9.1 provides to the contrary. It grants Marletto an affirmative right, at the end of the term, to require DFS to either leave the tenant improvements, or to remove the improvements and repair the damages caused by such removal.[27] Marletto holds the option, and has elected to have the improvements removed. Marletto's election is not unreasonable, considering the testimony that the premises are unlikely to be re-leased in their present condition. This obligation arises whenever the *Lease* is terminated, whether upon its successful completion or upon default of the tenant.[28] Therefore, the obligation under Article 9.1 to remove tenant improvements is not subject to the cap, and the debtor is liable for its performance, or lack thereof.

The parties also dispute the scope of the DFS's obligation under Article 9.1, and the amount of the damages recoverable. Marletto reads the *Lease* to require DFS to both remove the tenant improvements and restore the property to a condition suitable as a retail warehouse. DFS argues that it must simply remove the improvements. Looking to the language of the *Lease*, I find for DFS on this point. Article 9.1 gives Marletto the option to keep the improvements, or, at its election, have the improvements "removed by Tenant, . . . in which event Tenant shall at its expense repair any damage caused thereby."[29] Nothing in this section requires DFS to remodel the premises to a prior

---

[26] Joint Ex. 1-A, at 8.

[27] *See generally Energy Conversion Devices,* 483 B.R. at 125 (adopting *El Toro* and overruling the trustee's objection to the lessee's "Additional Damage Claims" for the debtor's obligation to maintain and repair damage to the leased premises).

[28] *Contrast Brown,* 398 B.R. at 219 (§ 502(b)(6) cap applied to limit refitting costs where such obligation arose only if tenant breached lease).

[29] Joint Ex. 1-A, at 8.

10

condition for the landlord's benefit. While DFS's obligations under Section 9.01 are outside the scope of § 502(b)(6), they are limited to removing the tenant improvements and repairing any damages caused by such removal. The only evidence submitted on this issue was Mr. Ferguson's testimony that it would cost between $100,000 and $120,000 to remove the improvements. Based upon this testimony, I find that Marletto has established damages for removing and repairing the tenant improvements in the amount of **$110,000.00.**

### 3. The Amount of "Rent Reserved" under the *Lease.*

Having determined that all components of Marletto's claim, except the cost for removal of tenant improvements, are the result of DFS's rejection of the *Lease*, the court must next determine which of these components are allowable as rent reserved. Allowed components are subject to the cap, which the parties agree lasts 15 months in this instance. The parties also agree that the monthly rental obligation, $27,000, and the 2014 real property taxes are included within the rent reserved calculation. However, Marletto argues that the tenant improvement payments and utilities are also recoverable as rent reserved.

In *In re McSheridan*,[30] the Bankruptcy Appellate Panel for the Ninth Circuit adopted a three part test to determine the "rent reserved" under § 502(b)(6).

---

[30] *Kuske v. McSheridan (In re McSheridan)*, 184 B.R. 91 (B.A.P. 9th Cir. 1995), *overruled on other grounds Saddleback Valley Cmty. Church v. El Toro Material Co., Inc. (In re El Toro Material Co., Inc.)*, 504 F.3d 978 (9th Cir. 2007). In *El Toro*, the Ninth Circuit expressly overruled *McSheridan*, but only to the extent that it read § 502(b)(6) to extend the cap to "tort claims other than those based on lost rent, rent-like payments or other damages directly arising from a tenant's failure to complete a lease term." *El Toro*, 504 F.3d at 980-81. However, *McSheridan* also adopted a three part test to determine whether other expenses could be considered rent reserved under § 502(b)(6)(A). The Ninth Circuit was clear that "we do not address the propriety of that holding." *Id*. at 982 n.8. As a result, courts continue to apply the *McSheridan* test to determine what is included in the rent reserved for purposes of calculating the § 502(b)(6) cap. *In the Matter of EDM Corp.*, 2009 WL 6338012, at *2 (Bankr. D. Neb. Dec. 21, 2009); *In re Liegey*, 2009 WL 3817902, at *5 (Bankr. M.D. Pa. Nov. 13, 2009).

11

      1) The charge must: (a) be designated as "rent" or "additional rent" in the lease; or (b) be provided as the tenant's/lessee's obligation in the lease;

      2) The charge must be related to the value of the property or the lease thereon; and

      3) The charge must be properly classifiable as rent because it is a fixed, regular or periodic charge.[31]

DFS's obligation to pay for tenant improvements satisfies all three parts of this test. Article 3.2 of the *Lease* provides that "[a]ny amounts that this Lease requires Tenant to pay in addition to the Monthly Rent will be "Additional Rent."[32] Further, the *Lease* specifically defines DFS's liability for tenant improvements "as additional monthly rent."[33] The tenant improvement payments satisfy the second and third *McSheridan* factors as well, because the payments clearly go to the value of the property, and are fixed, regular payments. Accordingly, I find that these payments constitute rent reserved, and are recoverable by Marletto.

DFS is also required to pay all utilities during the term of the *Lease*, as its sole responsibility.[34] This obligation is construed as additional rent, as defined under the *Lease*. However, courts have held that, even though a debtor may be obligated to make utility payments, such payments relate to the tenant's occupancy and use of the property, rather than its value.[35] These courts also hold that utility payments do not qualify as a fixed, regular or periodic charge. Because

---

[31] *Id.* at 99-100.

[32] Joint Ex. 1-A, at 3.

[33] *Id.* at 2, Art. 2.5.

[34] *Id.* at 4.

[35] *In re Creason*, 2013 WL 1385641, at *4 (Bankr. D. Kan. April 2, 2013); *In re Metals, USA, Inc.*, 2004 WL 771096, at *3 (Bankr. S.D. Tex. April 2, 2004); *In re Rose's Stores, Inc.,* 179 B.R. 789, 791 (Bankr. E.D. N.C. 1995).

12

monthly utility payments do not satisfy the second and third requirements of the *McSheridan* test, they do not qualify as rent reserved for purposes of calculation of the § 502(b)(6) cap. The utility component of Marletto's claim will be disallowed.[36]

### C. Calculation of Marletto's Allowed Claim

Based on the foregoing analysis, the allowable components of Marletto's claim are calculated as follows. First, under § 502(b)(6)(B), Marletto is entitled to recover past due, unpaid rent for one month in the amount of $27,000. Next, Marletto's claims for future monthly rent, real property taxes, the balance owed for tenant improvements, future real estate commission, remodeling costs (other than the removal of tenant improvements), and utilities exist only as a result of the rejection of the lease, and under *El Toro* are capped at the rent reserved for 15 months, the applicable period under § 502(b)(6)(A). Marletto is entitled to 15 months of rent payment and tenant improvement payments, plus the 2014 real property taxes. Marletto's claims for utilities and a future real estate commission do not qualify as rent reserved under the *McSheridan* test, and, therefore, these items are disallowed as amounts in excess of the cap.

Finally, Marletto's claim for removal of tenant improvements exists independently of the *Lease* rejection, and, therefore, falls outside of § 502(b)(6)'s limitations. Yet, the contractual language in Article 9.1 that gives rise to this obligation limits DFS's liability to the removal of the tenant improvements and the repair of any damage cause by the removal. Based upon the expert

---

[36] Marletto's claim for a future real estate commission also fails to qualify as rent reserved under *McSheridan*. The *Lease* does not obligate DFS to pay a real estate commission for Marletto to find a new tenant. Rather, Marletto raises the commission as damages for DFS' breach of contract that occurred upon rejection. Moreover, the claim has no relationship to the value of the property, nor is it a fixed, regular, or periodic charge.

testimony of J.A. Ferguson, Marletto's claim for removal of tenant improvements is allowed in the sum of $110,000.

## Conclusion

Marletto's claim is allowed in the sum of **$647,758.85**, calculated as follows:

| Item | Amount | Payments | Total |
|---|---|---|---|
| **Past Due Rent (1 Month)** | $ 27,000.00 | 1 | $ 27,000.00 |
| **Future Rent** | $ 27,000.00 | 15 | $ 405,000.00 |
| **Future Property Tax Obligation** | $ 48,000.00 | | $ 48,000.00 |
| **Tenant Improvement Payments** | $ 3,850.59 | 15 | $ 57,758.85 |
| **Costs to Remove Tenant Improvements** | | | $ 110,000.00 |
| **Total Allowed Damages** | | | $ 647,758.85 |

The allowance of Marletto's claim for attorney's fees is reserved pending supplementation of the record and further order of this court.

An order will be entered consistent with this *Memorandum.*

DATED: March 3, 2014

                                                BY THE COURT

                                                /s/ Gary Spraker
                                                GARY SPRAKER
                                                United States Bankruptcy Judge

Serve:  D. Bundy, Esq.
          R. Crowther, Esq.
          ECF Participants per NEF
          U. S. Trustee